Thank you, Your Honor. And I would like to reserve five minutes for rebuttal. You'll have to keep watch on your time. Thank you. May I please report? I am Patrick Walma. I represent Plaintiff Ben Porter, who brought a lawsuit on behalf of his daughter, who tragically died, Hanifa Nuruddin, while in the care and custody of San Francisco. The district court got it wrong. At every step, Defendant Terry and Defendant City failed to protect Ms. Nuruddin. And even after they failed to protect her, failed to follow safety protocols to recover her. And counsel, counsel, let me get straight to the part of this that that is of concern to me. It seems to me that Terry was indeed negligent, by not keeping a closer eye on your client's daughter. But what I have difficulty seeing is deliberate indifference, because negligence isn't good enough in this context. And it seemed to me that the deceased was supposed to be released soon. There's no evidence in the record that she had run away before or, you know, was and she was doing very well. And so it was definitely negligent. But where's the deliberate indifference in permitting her to escape to a fate unknown, except for its tragic end? Your question hits the nail on the head, so to speak, Your Honor. And what the court did was it took factual disputes that I'm about to list out for you, which if drawn in plaintiff's favor, which it should be at summary judgment, will show that Ms. Nerudin was at high risk for leaving. One, despite the claims that she was getting better, if you actually look at the record, increasingly in the weeks leading up to the incident, there were nurses' meetings that marked her and documented her as having poor judgment, poor insight. Just a week prior, it got worse. Just a week prior, the nurses' summary said, and Mr. Terry testified, he was a part of these meetings, that her appearance was disheveled, that she was an assault risk, that she had poor insight, poor judgment. No, but so far, none of that speaks to running away. Having poor insight and being disheveled are signs of mental unwellness, but they're not signs of running away. Well, the reason why they're all in a lockdown facility is because they have an inherent risk being mentally ill of elopement. In fact, Deputy Herrera said he's been there at least 20 times due to elopements from MHRC in particular. So the kind of patients that are kept there are all at elopement risk. That's the point of having, you know, the district court said it's undisputed that she was safe to go off campus, but that's a misstatement of the facts. In fact, she had an accompanied pass, which means that at all times, she had to be monitored, not because she's getting better. Yes, nobody's disputed that. The question is whether, why is it deliberate indifference instead of negligence? Deliberate indifference, even from an objective standpoint, requires a much higher bar for consciously disregarding a clearly known risk. So let me get to that point then and get right into the incident, which is the district court found that Mr. Terry took his eyes off of Ms. Nerding, since it's not a dispute right now, for just a second. But in his same testimony, he required to go up an elevator, walk down a 120-foot straight hallway to get to the reception room, and then he took her to the bathroom, and then he said he was watching her the whole time on the phone, and that brief second he put down the phone and looked back, she disappeared down a 120-foot straight hallway, waited for an elevator, and went down the elevator, all in the time that it took him to turn around. I guess, Jevon, in what sense is that issue material, given that he later did put eyes on her once he was able to get downstairs? That's a credibility determination. It's my opinion that he never laid eyes on her, because the amount of minutes it would take for her to do that means that he was likely taking that phone call and had abandoned her and left her unmonitored for several minutes. I thought he went down, I thought he got downstairs to the building and was able to see her and call out to her to stay. He said at some time, several minutes after wandering around, he spotted her allegedly. But there's nothing to corroborate that. And in fact, his testimony- Well, wait a minute, counsel. Corroboration isn't the point. Is there any contradictory evidence? Because this is sworn testimony just like the other. So what is the evidence to contradict his statement that he saw her? The fact that he, one, is taking so much time, several minutes it would have taken for her to walk down that hallway and disappear. And then the fact that he said he jogged after her in order to catch up to her, when there's substantial evidence in the record that he couldn't even run, jog, and in fact, his supervisor said that he walked with a limp and that he was- But not, counsel, none of that contradicts that he could have seen her. Because there's no, we don't know what she was doing when she got downstairs. She could have stood in the same place for five minutes until he got downstairs. So I don't understand how any of that contradicts his statement that he saw her, to the extent that that's relevant, whether he did. And I don't think it is because it took him 40 minutes to even go back and report it. And what that suggests is that none of that happened. He wandered around for 40 minutes. The district court said it's 15 to 20, but he allegedly makes this phone call at 1.50 p.m. The phone call goes out to the deputies at 2.31 p.m., which is 41 minutes, and they destroyed the record of that wandering around for an hour, two hours. The jury could conclude, based off of his testimony, that he had wandered around for 40 minutes, an hour, and didn't institute any of the calls that were there to make sure that she would get recovered. So, your honor, you ask what's delivered in difference. He was trained to first, very first thing he was supposed to do, notify the nurse and then call the deputies. He waited- Is there any time sequence from any testimony other than- We have the testimony from him saying at 1.50 p.m., and then we have the call record at 2.31 going out. So, a jury could conclude from that that it took him 41 minutes to return and initiate the call. For 41 minutes, he failed to inform his nurses required to call the deputy as required so that they could initiate canvassing. There's an on-campus sharing- Is there any testimony or evidence of other sort that directly contradicts his statement of when he made the phone call? You're drawing an inference that he must have been lying about it, but is there anything that is different about when he made the initial call? Well, I think the jury, based off of the several different points of where he's lied- That is not responsive to my question. You don't have to answer it, but my question is whether there's any evidence that directly contradicts his statement as to what time he made the initial phone call. It's a yes or no question. There's none for the initial, only for the call to the deputy. There's potentially many reasons for that. I'd like to turn to a slightly different aspect of this and ask whether there is any case that was sufficiently similar to this that would have put the defense on different behavior, assuming in the way that you would have us assume it. Yes, Your Honor. I believe that Castro v. County of Los Angeles established facts or an important legal element, which is the idea of monitoring people that have a medical condition. In this case, she's schizophrenic. In Castro, they left the inmate unmonitored for only six minutes. It's a quite different set of facts. You were dealing with violent inmates who were incarcerated together. It's quite different. Is there anything similar in terms of keeping an eye on someone who's in not a prison setting or someone running away in that circumstance? How about a state of Connors v. O'Connor, where the court found that in a psychiatric hospital, they denied qualified immunity where a patient safety protocol wasn't followed as far as keeping an eye on segregating penal code patients from civil patients. Similarly here, there's patient safety protocols that weren't followed, and then the ones that were there were deficient in making sure. It seems to me those situations are where someone is placed in a setting where another person is going to hurt them. We don't know that any other person hurt the deceased in this case. There's no knowledge of how it is she came to die in the construction zone. I guess to my mind, those are not very similar. I'm not sure that that would give much notice that this was a violation. In one, I think under Hope v. Peltzer, the Supreme Court noted in 2002 that novel circumstances or novel facts aren't necessarily preclude a denial of immunity when there's significant principles or elements of the claim that would have let the person know that they shouldn't be doing that. For instance, in this case, there's a long line of case law that says that there has to be a constitutional right for safe confinement of the mentally ill that are involuntarily hospitalized or in prison, including Ammons v. State Department of Social and Health Services, Youngblood v. Romero. It's a long-standing principle. So he was trained in all these safety protocols and yet he abandoned them. And he violated them in under around 30 minutes when Ms. Nerding could have been recovered. And at this time, Your Honor, if you have no further questions, I'd like to reserve the balance of my time. You may do that, counsel. We will next hear from Mr. Lippman. Good afternoon, Your Honors. Good afternoon, Your Honors, and may it please the Court. Deputy City Attorney Mark Lipton on behalf of appellees sitting in the County of San Francisco and James Terry. This Court should affirm the District Court's order granting summary judgment. When considered in the light most favorable to appellants, the facts including how long Mr. Terry turned around to pass the phone back through the window slot, and all of the other facts demonstrate that Mr. Terry was not deliberately indifferent. There are three groups of facts that demonstrate this. First, the District Court was correct in finding that there are no facts giving Terry reasonable notice that the decedent was a potential flight risk. Council mentioned the medical records before, and in fact, three weeks before the elopement, on April 8th, the case management summary that was prepared 22 days before the elopement said that the decedent was, quote, alert, cooperative, and attentive. Rocking a pad of paper with questions, has been treatment compliant, will continue to abide by the treatment plan for her. Supplemental excerpt of record 143. Two weeks after that, on April 23rd, the weekly summary report of decedent's care says, quote, AWOL, meaning absent without leave, which is what happened here, not at issue. This is at supplemental excerpt of record 104, and this not at issue AWOL classification here was the lowest of six possible ratings that the caregivers had. They included minimal, low, moderate, high, and extreme, and she had the lowest. So this was a specific evaluation with regard to this particular client's propensity for AWOL, and this is only one week before it actually happened. In late April, the staff at the mental health rehabilitation center was anticipating, as was mentioned before by your honor, that the decedent would be discharged soon into the community, into housing, and there was already a search underway to find housing for her, and that is documented in a group of emails that's attached to the supplemental excerpts of record 175 to 187. Dr. Geiser, who was the psychiatrist at the Merck, wrote an order on April 27th, this is only three days before the AWOL in this case, that order written by Dr. Geiser, the psychiatrist, was for decedent to have staff accompanied passes. That's at supplemental excerpt of record 91. That same day on the 27th, the court approved the staff accompanied passes, and that same day Mr. Terry escorted decedent. So this is three days before, we have the same people involved, Mr. Terry and decedent. This time Mr. Terry escorted decedent to an ENT appointment, an ear, nose, and throat appointment, and he wrote a signed note in the record, your honor, and that note states, quote, client was cooperative and asked intelligent and informational questions. The client was Mr. Terry has a bachelor of science in psychology and sociology and a master's degree in mental health. By April 30th, the day of the AWOL, Mr. Terry had accompanied between 150 and 200 clients from the Merck on staff accompanied passes, and zero of them had successfully AWOL. There was one particular client who went out in the community, attempted to AWOL by telling him he wasn't going to go back when he saw some of his friends, but Mr. Terry was able to successfully, with skills that he was taught, return him to the center, and that is at excerpt of record 378 through 380. As to decedent specifically, Mr. Terry had 50 to 60 interactions with her. That included running the group therapy sessions that she attended, excerpt of record 359. Mr. Terry knew that when decedent first came to the Merck that she was delusional, but once she got on her medication, that dissipated, and on the day of this AWOL, April 30th, before they left the Merck, Terry attended morning rounds, and at those rounds were the psychiatrist, the nurses, the social workers, the health care workers for the clients there, including those for decedent, and that's where decedent's condition would have been discussed. There was nothing from those meetings that gave any indication that she was an AWOL. She was still schizophrenic, though, was she not? I'm sorry, your honor? She was suffering from schizophrenia? From schizophrenia? Yes. No question, your honor, and I believe, as Justice Graber mentioned before, the symptoms of and is supported in the record are not related to AWOL, and as a matter of fact, with regard to the rating of AWOL as being not an issue that I just mentioned before, on that same form, up above that, there are five conditions for safety. None of those conditions of safety were concerns for decedent, and on this first page of that document, the same document I mentioned, it also includes these same symptoms, the symptoms of and at the same time, so that's an example of the medical provider seeing these schizophrenic procedures, I'm sorry, symptoms, and yet making the same determination that notwithstanding those symptoms, this patient was not AWOL. In fact, she was the lowest category of those six that I mentioned. The second group of facts, your honors, that demonstrates that Mr. Terry's observations of decedent on April 30th were consistent with the determination that had been made that she was not a flight risk include, on that same day, that morning, Mr. Terry conducted his group therapy session, and at that session was decedent, and his note from the session, moments before they go out on the staff-accompanied visit, is that she was actively, she actively participated, and that that was typical for her, and that's an excerpt of record 398-399. Mr. Terry met decedent at the nurse's station and got her medical card and the other papers that he was going to take with him to the ophthalmology department from the nurse on duty, O. Kupnik. It was Mr. Terry's practice to take his phone with him when he would go out and leave the unit, but that morning, he didn't check to see that he had his phone. Excerpt of record 486. Mr. Terry did not deliberately leave his phone on the unit. He forgot. On the walk over to ophthalmology, Mr. Terry testified that they had a good conversation, he and decedent. They got there, they checked in, they sat down in the waiting room, and he recounted how they were watching Jerry Springer on TV, and they were commenting on how crazy it was. Then decedent requested to go to the bathroom, so Mr. Terry escorted her outside of the waiting room into the hallway to the bathroom, waited for her to finish, and then escorted her back in, and they sat down in the waiting room without incident. No indication that she was unhappy, disturbed, acting any way indifferently than she had been before or that she wanted to AWOL. Third group of facts, your honors, that show that there is no deliberate indifference and that the facts are consistent with Terry's testimony, that he looked away from decedent for only a second when he returned the phone back, and that the district court was correct in finding that appellant did not show that Terry acted unreasonably. When he got the phone call, he went up to the glass, and he turned around and watched decedent during the call. Terry testified that she was in his direct line of sight for the entire call. She remained in his seat, he said, and there was no indication that she was even going to stand up, let alone run away. Excerpt of record 434-436. After the short call, Terry turned his back to return the phone back into the slot. His testimony is that it was for one second, and when he turned back, decedent was gone. Now, Mr. Terry ran out into the hallway, and there was some mention here by counsel that it was a straight hallway, but that's not the case, because Terry didn't see her. So the first thing he did was he looked in the bathroom where he had just taken her before, reasonable, she had been there before, maybe she went back to the bathroom. He was not expecting her to AWOL, this was not indicated. He went to the bathroom, checked she was not there. He went back out into the hallway. Terry testified specifically the entire hallway was not straight. He said, quote, you have to go down and you go around some stuff. You can't see the others. There's another set of elevators, but it's not a whole straight wall. It's like offices or something here that obscures the vision. So you have to make a right. That's an excerpt of record 445 through 446. Terry took that elevator down into the lobby. He got down there. He looked left. He looked right. He didn't see her. So he went outside of the building into the parking lot. He testified that he speed walked, that he walked very quickly. He went down the driveway to 23rd Street. Didn't see her. So then he looked down Potrero and he jogged down there. He testified specifically that his cane was in his hand. Quote, I wasn't using it, close quote. Excerpt of record 452 through 453. Mr. Lutton, I take it the position on the other side essentially is that we just shouldn't believe anything that you've just recounted from Mr. Terry. And what's your response to that? That's what I heard him say. My response is that that's not what the testimony is. That's not what these facts that I've been recounting to you indicate or support. That the district court's determination that the testimony was not only credible but logical also shows that that's not the case. The credibility is ordinarily not appropriate on summary judgment. We have to take any dispute effects in favor of the plaintiff. So to me, the real question is whether any of the facts that you've recounted on which you're relying are disputed by contradictory evidence. Because if they are, we'd have to discount them. Your Honor, there is no evidence that contradicts Mr. Terry's testimony. None of this evidence. And it's purely argument. It's purely speculation. The Castro case, as Justice Graber mentioned, it is not on point. The facts are extremely different. It should not be used to expand the rights that pretrial detainees and mental health patients receive. It's just not on point here. Also, Judge Dawson had a question about the timing. I am concerned about what is your opinion on how much time was involved in the time she left or eloped and he reported her missing. Well, the beautiful thing is, Your Honor, I don't have to render an opinion because it's in the facts. Because Mr. Terry testified. I want you to recite it for me. I'm sorry? I want you to recite those for me. I absolutely will, Your Honor. Mr. Terry testified that he took the call at approximately 1350. That's also recounted in the unusual occurrence report. And that is supplemental excerpt of record 190. Then, the Dr. Geiser's order entered in the medical record, the psychiatrist at the Merck. His order says, quote, start AWOL protocols, close quote. And that was done at 1415, 25 minutes later, after the unusual occurrence says that the call was taken. And Dr. Geiser's order, demonstrating that the AWOL policy is being started, is that supplemental excerpt of record 91. So between 1350 and 1400, I'm sorry, and 1415, that's 25 minutes. That is absolutely consistent with Mr. Terry's testimony that it took him 10 minutes to find the decedent. Because Mr. Terry testified, from the time in the waiting room, when he turned back from passing the phone and saw that the decedent was gone, until the time that he saw her at the bus stop on 22nd Street, 10 minutes had passed. And that's excerpt of record 461. And then from the time that he ran up Hampshire Street, because when he screamed out to her, Hanifa, don't do this, don't do this. He successfully directed her, redirected her rather, from boarding that number nine bus that was pulling up. In response, she didn't board the bus and go into the wind. She ran away. And from that moment until the moment that he returned to the Merck to report her AWOL, he testified that was an additional 10 minutes. And that's excerpt of record 461 through 462. So when we do an overlay of Mr. Terry's testimony of approximately 20 minutes, and then the independent documents that document about 25 minutes, it is absolutely consistent. And as a matter of fact, it's very reliable because there are four different sources here. At least three different sources here. We have Terry's testimony. We have Dr. Geiser's note in the medical record. And we have Nurse Okupnik's note, the nurse on duty, in the unusual occurrence report, all of which I've given you the excerpt of record notations to. So the facts here demonstrate that at very most, even when they're taken in the light most favorable to appellate, perhaps as Justice Graber mentioned, there's negligence, perhaps. But as the district court found, there is no basis for a finding of deliberate indifference. Thank you, Counselor. You've exceeded your time by quite a bit. So we appreciate your time. And Mr. Welner, you have a little bit of time remaining for rebuttal. Thank you, Your Honor. I'll just like get straight to the point. In a 1983 case where the defendant is the only surviving witness, there's supposed to be extra scrutiny and allow for a jury to use the evidence on the record in order to come weigh this evidence and come to a decision as to whether or not Mr. Terry was being truthful. Also, as you heard Counsel say, he interacted with her 50 to 60 times. So he should have known that she had poor insight and poor judgment as the nurses documented. Furthermore, from the time of admittance through all the records, she couldn't articulate why she was being held. And Counsel wants to stylize her next step as being back into the public. They were trying to find her another mental health hospital that wasn't locked down to transition her to because she was still schizophrenic and suffering from the same problems she did before, an inherent medical illness. The next portion is that she was delusional from the time that she got there until the time that she left. She couldn't articulate why she was in the hospital because she still suffered from schizophrenia. Also, really in this case, there's two claims. There's the claim of deliberate indifference when he leaves her on monitor for several minutes. Then there's the second claim when he's in deliberately indifferent to his safety protocols, when he didn't immediately ask her to call the nurse and initiate a protocol to bring her home. How about deliberate indifference where he has to look at her and find that he left her on monitor for several minutes, allowing her to escape. Is that deliberate indifference to have left her on monitor? Then the next step is the jury has to find, well, was it deliberately indifferent for him knowing that she's schizophrenic and mentally unwell to then wander around on a cane and pass a security guard, not tell him, pass the front desk, not call and initiate the protocol. The point of the protocol, he's the last safety link. The point that why he's monitoring her, he's the only safety link there. So when he doesn't call immediately the deputies or the nurses, no one can canvass the campus and assist. And it's ironic because Mr. Terry says that, oh, he saw her and she ran away. Well, he just went through all the self-serving testimony about how he could jog and doesn't need his cane. Why didn't he run after her? This is the testimony. Because it didn't happen that way. The jury doesn't have to accept those facts. Dr. Geiser's report was written well after the fact. So the jury could take the time when the actual phone call was made, which was 2.31 in the alleged time when he began the initiation of the phone call at 1.50 and say, for 41 minutes, Mr. Terry was wandering around, worried about his job, didn't want to report that he had lost his patient and that he had violated all his safety protocols, didn't bring a communication device. The district court said he wasn't required to, but both his supervisor and defendant Terry testified that he was trained to carry his communication device. His testimony may be that he forgot it, but a jury doesn't have to accept that. They could say that he wandered away and when he wandered looking for Ms. Nerdeen, that he was doing so because he was covering up for all the mistakes and errors and deliberate indifference that he had caused. He created a problem. Counsel, you've exceeded your time as well. So I believe that we understand the positions of both parties and the case just argued is submitted and we very much appreciate the helpful arguments from both counsel. Thank you, Your Honor. Thank you.
judges: Graber, Dawson, Bress